1          UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF TEXAS
2                  AUSTIN DIVISION

3  UNITED STATES OF AMERICA ) Docket No. A 18-MJ-516(1) ML
                            )
4  vs.                     ) Austin, Texas
                            )
5  RODNEY GLENN GREEN       ) September 17, 2018

6

            TRANSCRIPT OF PRELIMINARY/DETENTION HEARING
7             BEFORE THE HONORABLE ANDREW W. AUSTIN

8

9  APPEARANCES:

10 For the United States:    Mr. Alan M. Buie
                             Assistant U.S. Attorney
11                           903 San Jacinto Boulevard,
                             Suite 334
12                           Austin, Texas 78701

13

14 For the Defendant:        Mr. Horatio R. Aldredge
                             Assistant Federal Public Defender
15                           Lavaca Plaza
                             504 Lavaca Street, Suite 960
16                           Austin, Texas 78701

17

18 Transcriber:             Ms. Lily Iva Reznik, CRR, RMR
                             501 West 5th Street, Suite 4153
19                           Austin, Texas 78701
                             (512)391-8792
20

21

22

23

24

25 Proceedings reported by electrical digital sound
   recording, transcript produced by computer.

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Bennett E. Forrest | 8 | 43 | 54 | |

**E X H I B I T S**

| | Offered | Admitted |
|---|---|---|
| Government's | | |
| #1 through 3 | 20 | 20 |
| #4 through 5 | 23 | 23 |
| #6 | 39 | 39 |
| #7 | 23 | 23 |
| #9 through 10 | 29 | 29 |
| #11 through 12 | 30 | 30 |
| #14 | 35 | 35 |
| #15 through 16 | 32 | 32 |
| #18 | 36 | 36 |
| #19 through 21 | 41 | 41 |
| #22 | 42 | 42 |
| #23 | 28 | 28 |
| Defendant's | | |
| (None.) | | |

```
1                    (Proceedings commence at 2:36 p.m.)

2             THE CLERK:  Court is now in session for a

3    preliminary detention hearing:  18-MJ-516, United States

4    vs. Rodney Green.

5             MR. BUIE:  Alan Buie for the government.

6             Good afternoon, your Honor.

7             THE COURT:  Afternoon.

8             MR. ALDREDGE:  And Horatio Aldredge for Mr.

9    Green.

10            THE COURT:  Afternoon.

11            We're here on the -- is it preliminary and

12   detention?

13            MR. BUIE:  Yes, your Honor.

14            MR. ALDREDGE:  That's right.

15            I think Mr. Green needed to address the Court

16   before.  Do you want to address the Court?

17            THE DEFENDANT:  It's okay?

18            THE COURT:  Okay.

19            THE DEFENDANT:  My question is, your Honor, how

20   do I change attorneys if I need to do so?

21            THE COURT:  Uh --

22            THE DEFENDANT:  I know what you're thinking.  I

23   just met this guy, what, 40 minutes ago, so I know.  How

24   would I know I need a new attorney, which you're probably

25   wondering.
```

1          THE COURT:  If you believe you need a new

2    attorney, you can raise it with the Court, either as

3    you're doing right now or send -- send us something in

4    writing.  Let your attorney know and Mr. Aldredge can make

5    that motion.

6          Is that where you are right now?

7          THE DEFENDANT:  Yes.  We already discussed that

8    and had our little confrontation.  But if it's possible, I

9    would like to have another attorney.  I don't think I will

10   get a good legal counsel from this guy here as far as

11   strategies and things that needs to be done on this here

12   particular case.

13         THE COURT:  Okay.  Well, let me just say this.

14   You know, Mr. Aldredge is a member of the Federal Public

15   Defender's Office.  He's the head of that office here in

16   Austin.  He's been doing this for I'm not sure how many

17   years but as long as I've been on the bench, almost 20

18   years now.  He's well-respected by all the judges in this

19   courthouse.  He's probably got more experience in federal

20   court than probably other than the people who he works

21   with, who are also federal public defenders, anyone else

22   in town.  He knows the judges well; he knows the

23   sentencing guidelines well; he knows the law well.  He

24   teaches other lawyers.

25         I think you might be making a mistake if you want

1 me to give you somebody else, it's going to have to be

2 somebody that's less qualified than Mr. Aldredge.  So if

3 that's what you want, that's what we'll do.

4           THE DEFENDANT:  Okay.  We'll go with him.  Thank

5 you, your Honor.  I need to hear that.  Thank you.

6           THE COURT:  And, you know, I don't know if I'm

7 throwing Mr. Aldredge back into a situation he doesn't

8 want, but I would encourage you to work with him.  He

9 knows what he's doing.  If you think you can work with

10 him, Mr. Aldredge, if you think you work with Mr. Green.

11           MR. ALDREDGE:  Sure.  I have no idea where this

12 came.

13           THE COURT:  Okay.  Then I would encourage you

14 to --

15           THE DEFENDANT:  With experience.  Thank you, your

16 Honor.

17           THE COURT:  All right.  Okay.  All right.

18           Mr. Buie, I'll recognize the government.

19           MR. BUIE:  Okay.  Judge, so we are going to go

20 ahead and go forward.  I would --

21           THE COURT:  Is that -- is that the intention --

22           MR. ALDREDGE:  That's right, your Honor.

23           MR. BUIE:  All right.  So yes, your Honor.

24           We have before the Court two things.  Of course,

25 Mr. Green is here on a complaint, and so, we have a

1    preliminary hearing on that.  We also have a motion to

2    detain pending.  And with the Court's permission, I'll

3    just present evidence once and cover both of those.  And

4    if I could, just by way of introduction, make a brief

5    statement as to what we're going to present in the way of

6    evidence.  It's not super-complicated, but it's a little

7    more complicated than usual in one of these cases.

8            As the Court is aware, the complaint charges Mr.

9    Green with one bank robbery that took place in San Marcos

10   on the 28th day of April of this year.  And so, we'll

11   present evidence on that in order to meet our probable

12   cause burden for the preliminary hearing.

13           But the FBI's investigation has determined and

14   their belief is that Mr. Green actually committed five

15   banks robberies and four commercial robberies between

16   December 26th of 2017 and April 28th of this year, and all

17   of those robberies, the evidence will show, were armed

18   robberies.  Eight of them with a firearm, one of them with

19   a knife.

20           And so, we intend to -- although without going

21   and putting on an elaborate case on nine different

22   robberies, I don't intend to do that, but to provide some

23   evidence on at least more than just the ultimate April

24   28th robbery that he's charged with.

25           THE COURT:  Okay.

1          MR. BUIE:  All going to dangerousness in our

2   motion to detain.

3          Now, one thing about this, last thing I'll say by

4   way of introduction, is that the bank -- well, the robber

5   in all nine of the robberies that I just mentioned had a

6   mask, was wearing a mask.  So the evidence will show that

7   no one, none of the victims, no other witnesses really saw

8   his face, at least not that we know of yet.  So the

9   evidence that we're going to present, as the Court will

10  see, has to do with certain physical evidence, certain

11  artifacts that can be seen in the robberies both by

12  witnesses and through surveillance images that then are

13  connected to Mr. Green because they were found in a

14  storage unit that he controlled at the time.

15         So it may seem a little discombobulated, but

16  that's what we're trying to do is to establish it's really

17  about identity.  And so, if there are no questions, I'll

18  go ahead and call the government's witness.

19         THE COURT:  Anything you need to add on anything?

20         MR. ALDREDGE:  No, your Honor.  Mr. Buie can

21  provide me the discovery.

22         THE COURT:  Okay.  All right.

23         MR. BUIE:  The government calls Bennett Forrest

24  to the stand.

25         THE COURT:  Make your way around here.  Raise

1   your right hand, please.

2             THE CLERK:  Do you solemnly swear or affirm that

3   the testimony which you may give in this case before the

4   Court shall be the truth, the whole truth, and nothing but

5   the truth?

6             THE WITNESS:  Yes, sir, I do.

7             THE COURT:  Have a seat.

8             THE WITNESS:  Thank you.

9             THE COURT:  Make sure you just pull that

10  microphone so it's more or less pointing at your mouth.

11            THE WITNESS:  Thank you, sir.

12            THE COURT:  That will work.  All right.

13        Mr. Buie.

14        MR. BUIE:  Thank you, your Honor.

15    BENNETT FORREST, called by the Government, duly sworn.

16                     DIRECT EXAMINATION

17  BY MR. BUIE:

18  Q.  Sir, would you just state your name and spell it for

19  the record and tell the Court how you're employed?

20  A.  I'm Bennett E. Forrest.  That is B-E-N-N-E-T-T, last

21  name is Forrest, F-O-R-R-E-S-T.  I am a special agent with

22  the FBI here in Austin, Texas.

23  Q.  Sir, are you the case agent assigned to the matter of

24  United States vs. Rodney Glenn Green?

25  A.  Yes, sir, I am.

1  Q.   And I'm -- if the Court doesn't mind me just sort of

2  moving around, I'm going to approach the witness and show

3  you, this is something that's in the Court's record, or

4  it's document three in this matter.  Do you recognize

5  that?

6  A.   Yes, sir, I do.

7  Q.   Is that a criminal complaint that you actually signed

8  in order to get the arrest warrant for Mr. Green?

9  A.   That is correct.

10 Q.   And now, the defendant in this case, Rodney Glenn

11 Green, is that someone you've actually seen and met in

12 person?

13 A.   Yes, sir.  That is correct.

14 Q.   And if you saw him again, would you recognize him?

15 A.   Yes, I would.

16 Q.   Is he in the courtroom today?

17 A.   Yes, he is.

18 Q.   Where is he seated in relation to me and what's he

19 wearing?

20 A.   Mr. Green is to your back and right in a

21 green-and-white jumpsuit.

22 Q.   Your Honor, may the record reflect the witness

23 identified the defendant?

24       THE COURT:  It will so reflect.

25 Q.   (BY MR. BUIE) So very briefly, how long have you been

1   an FBI agent?

2   A.   Approximately eight years.

3   Q.   Okay.  Have you ever worked on bank robbery cases

4   before?

5   A.   Yes, sir, I have.

6   Q.   In Austin or elsewhere?

7   A.   In Austin.  Also, the Rio Grande Valley.

8   Q.   Now, just briefly, if you would, describe the

9   incident that led to the charge that for which Mr. Green

10  is being held at this time.

11  A.   Yes, sir.  On April 28th, 2018, FBI received a call

12  that the San Marcos Bank of America bank branch had been

13  robbed.  That was located at 308 East Hawkins in San

14  Marcos.

15  Q.   Okay.  And is Bank of America, is that an

16  FDIC-insured bank?

17  A.   Yes, it is.

18  Q.   And based on your investigation, did the individual

19  actually take money from that bank?

20  A.   Yes, sir, he did.

21  Q.   Now, at the time that that robbery came to the

22  attention of the FBI, did the FBI or other law enforcement

23  know who had committed it?

24  A.   Yes, sir.

25  Q.   Okay.  Was -- were victims or witnesses there able to

1  see the face of the person who committed the bank robbery?

2  A.   No.  They were not.

3  Q.   Why not?

4  A.   Because his face was covered with a mask.

5  Q.   So how -- if you would, just summarize or explain,

6  how did law enforcement come to focus on Mr. Green as

7  possibly being the robber in that case?

8  A.   Yes, sir.  Responding officers and detectives with

9  the San Marcos Police Department did respond to the scene.

10 After viewing surveillance footage, they did observe a

11 silver or light-colored sedan leaving the scene.  The

12 detective later, after viewing the Bank of America

13 surveillance video, went to a store in San Marcos, which

14 is a supply store, and was able to grab a -- or observe a

15 partial tag with that vehicle.

16 Q.   Okay.  So you were talking about you mentioned

17 surveillance, but is one of those at the bank and then,

18 another one at a second location?

19 A.   Yes.  There was two surveillance videos.  And the

20 first video was at the Bank of America in which the

21 detectives saw the suspect come to the bank, I believe,

22 approximately 9:03 a.m., left at approximately 9:05 a.m.

23 on that Saturday, went towards an alley.  Within seconds,

24 the San Marcos detective observed the vehicle on the

25 surveillance video leaving the scene.

1  Q.   Okay.  You have a number of exhibits in a folder

2  there.  Would you find what's been marked as Government's

3  Exhibit 1, please?

4  A.   Yes, sir.

5  Q.   Have you seen that before?

6  A.   Yes, I have.

7  Q.   What is that photograph?

8  A.   That is a photograph of our suspect vehicle that

9  was --

10 Q.   And what's the source or origin of the photograph?

11 Is that surveillance video or something else?

12 A.   That is surveillance video.

13 Q.   Okay.  All right.  So having observed a vehicle

14 departing the scene of the robbery, what investigation

15 occurred with respect to that vehicle?

16 A.   On the 28th of April, that was a special event in San

17 Marcos, they were actually having a parade.  So the San

18 Marcos PD detective understood that there was only a

19 couple of directions that that vehicle could have taken

20 due to the parade and the people in the street.  Following

21 logical routes, that detective went to a store there in

22 San Marcos to try to retrieve additional video footage in

23 which he believed that vehicle would have fled.

24 Q.   Okay.  And did he observe anything significant on the

25 -- whatever images he got at that location?

1  A.   Yes, he did.   He was able to identify two possible

2  digits from that license plate of that vehicle.

3  Q.   Okay.   And then, what did he do with that

4  information?

5  A.   With that information, he did a -- what he called a

6  wildcard query.   With that, he was able to get returns on

7  approximately 70 different vehicles of silver Impalas.   He

8  knew it was a between 2006 and a 2012 Impala.   After

9  reviewing the footage and doing the search, he inputted

10  some of the digits, and he was able to identify down to a

11  particular tag.

12  Q.   Okay.   So let me just see if I understand what you're

13  saying.   He was able to search, what, some kind of a

14  database, is that right, to find similar cars?

15  A.   That is correct.

16  Q.   He was able to search with partial tag numbers to

17  narrow it down?

18  A.   That is correct.

19  Q.   Okay.   So he -- what, did he narrow it down to some

20  -- some group of vehicles and then what?

21  A.   After he was able to identify the vehicles and

22  reviewing the surveillance video footage, he was able to

23  put the plate together.   Then he performed -- he ran that

24  video -- that plate and he -- after running that plate, he

25  was able to identify that that vehicle checked back to a

1  Mr. Rodney and Tammy Green.

2  Q.   Okay.  And who is Tammy Green?

3  A.   Tammy Green is the wife of Mr. Rodney Green.

4  Q.   Okay.  What next -- what happened next once he had

5  identified them as being what -- was the vehicle

6  registered to them?  Is that what you're saying?

7  A.   Yes.  That's what I'm saying.  Yes, sir.

8  Q.   Okay.  What happened next?  What did he do?

9  A.   He did a internal database query within the San

10 Marcos Police Department in which he ran both Rodney and

11 Tammy Green.  He was able to identify a traffic or past

12 history with Mr. Rodney and Tammy Green within the San

13 Marcos Police Department.

14 Q.   And what was the nature of that history or whatever

15 it is you just referred to?

16 A.   Yes, sir.  That was a contact that they made with Mr.

17 Rodney and Tammy Green on April 20th, approximately one

18 week before the bank robbery, in which they were observed

19 walking down I-35.  San Marcos Police did make contact

20 with them on I-35, and just asked them what they were

21 doing.

22 Q.   Okay.  So at that point, having identified a vehicle

23 and connected it to an individual or two individuals.

24 A.   That is correct.

25 Q.   Then what was done next in the investigation?

1   A.   After reading that report from the 20th, Mr. Green

2   had told the responding officers on the 20th that he was

3   driving a silver Impala and that it had recently been

4   impounded, and that they were staying at the Super 8 Motel

5   in San Marcos.  Once the detective understood that, he

6   went ahead and traveled to the Super 8 Motel in San Marcos

7   and made contact with the staff in which, yes, they did

8   confirm that they had checked in under Tammy Green.  And

9   that the desk clerk did remember the -- Mr. Green's

10  vehicle being towed by a repo man.

11  Q.   Okay.  And so, keep going.  What was the next -- next

12  step in the investigation after he confirmed that they had

13  stayed at that motel?

14  A.   Yes.  At that point in time, or around that point in

15  time, approximately, the San Marcos detective had

16  contacted the FBI here in Austin, Texas and spoken with

17  one of our task force officers.  Our task force officer,

18  after learning of what our suspect was wearing, including

19  the mask and the black hooded jacket and along with the

20  silver Impala, went ahead and informed the San Marcos

21  Police Department that this was most likely going to be

22  involved with our other -- other previous bank robberies.

23  Q.   So those had taken place where?

24  A.   Which had taken -- there was four other separate bank

25  robberies which had taken place here inside Austin, Texas.

1    Q.   Okay.  And could you just say, one more time, what

2    was the common thread that made them think that there was

3    a connection between the San Marcos robbery and the

4    previous Austin robberies?

5    A.   Not only the clothing to include the black jacket,

6    the mask and, also, the vehicle.

7    Q.   Okay.  I don't think we had talked about a black

8    jacket before.  Would you explain what you mean by that?

9    A.   Yes, sir, I will.  I apologize to the Court.

10         During the last four out of five bank robberies,

11   the suspect did wear a black hooded jacket with somewhat

12   of a subdued stripe down the middle of the jacket.

13   Q.   Okay.  All right.  So did you or other investigators

14   ever locate the Malibu, the silver-colored vehicle that

15   you've been referring to in your testimony?

16   A.   Correct.  I made contact with the detective from San

17   Marcos on the evening of the 28th.  We conversed and spoke

18   about the similarities and the different crimes, and we

19   agreed to meet up on the 29th, which was a Sunday, to

20   check the local motels and hotels in San Marcos and,

21   additionally, the tow yard in which the vehicle had been

22   towed to in San Marcos.

23   Q.   Okay.  And what did you find at that time?

24   A.   We had negative success on checking the hotels and

25   the hotels in San Marcos.  Going back and thinking through

1   previous investigations, including the four other bank

2   robberies that occurred in Austin, Texas, two of them had

3   occurred around the Capital Plaza area here in Austin,

4   Texas.

5   Q.   And is that a shopping center up on I-35?

6   A.   That is correct.  Yes, sir.

7   Q.   Near 290 and 51st Street in that --

8   A.   That is correct, sir.  Being that, you know, the

9   other bank robberies or similar bank robberies had

10  occurred in that area, we decided to travel from San

11  Marcos to Austin to try to query or spot check, spot check

12  surveillance for the vehicle to see if it was located in

13  any of those hotel parking lots.

14  Q.   Now, at that point, other than -- other than the

15  information you've already described, did you or other

16  investigators have other information about Mr. Green, his

17  background, anything else to suggest that he might be

18  involved?

19  A.   At that point in time, before obtaining the license

20  plate, that is a negative.  No, sir.

21  Q.   Okay.  Well, I'm talking about after obtaining the

22  license plate, at the time that you were looking for the

23  vehicle, was there any other information about him?

24  A.   No, sir.

25  Q.   Okay.  All right.  So where, if anywhere, did you

1   eventually find the silver car?

2   A.   We queried multitude of hotels and motels along I-35

3   and around the Capital Plaza area.   Shortly before

4   terminating the surveillance operation, we pulled into the

5   Stay 6 Suites.

6   Q.   I'm sorry.   The what?

7   A.   Stay 6 Suites, the Motel 6.   It's part of the Motel 6

8   chain.

9   Q.   Okay.

10  A.   After looking in the hotel, we located the vehicle,

11  parked in the rear of the hotel -- excuse me, it's a

12  Studio 6 hotel.   I apologize.   It is a Studio 6 hotel.   We

13  found the vehicle located in the back part of the hotel

14  parking lot.

15  Q.   Okay.   Did you do any other investigation there at

16  the -- at the hotel other than just finding the car?

17  A.   Yes.   So after we located the vehicle, we contacted

18  several detectives from San Marcos and, also, agents from

19  the FBI and task force officers.   We made contact with

20  people there at the front desk who had informed us, yes,

21  that Tammy Green, Rodney Green's wife, had checked in on

22  the day of the 28th.   During check-in, she had paid with

23  cash and that she had booked multiple days' stay there at

24  the Motel 6.

25  Q.   Okay.   All right.   What else, if anything, did you

1    find out about Ms. Green or Mr. Green there at the Studio

2    6?

3    A.    After actually setting up surveillance on the 29th,

4    we made contact with an Austin Police Department officer,

5    patrol officer who was actually there on the 28th of the

6    day that Tammy -- actually, right then when Tammy was

7    checking in.  He observed her paying with what he

8    described as with new $20 bills that were fresh and that

9    she checked in.

10          Additionally, we had -- when we spoke with the

11   front desk clerk, they had provided us with Room 359 in

12   which they were staying at.

13   Q.   At some point after that, did you or other officers

14   actually see Tammy Green at the Studio 6 Motel?

15   A.   That's correct.  After setting up surveillance, we

16   did observe -- the people in the ground did observe Tammy

17   Green leave Room 359 and walked towards the silver Malibu.

18   When she left, the San Marcos detective had already run

19   her driver's license history in which once he identified

20   that she had suspended -- or a suspended license.

21   Q.   Okay.  But she got in the Malibu and drove off?

22   A.   That's correct.

23   Q.   By herself or with somebody else?

24   A.   By herself.

25   Q.   All right.  What happened next?

1  A.   Austin Police Department performed a traffic stop in

2  which they arrested her with driving without a license.

3  In plain view, they observed gloves in the backseat.  And

4  obviously that is the vehicle that was later applied for

5  for a search warrant.  Ms. Tammy Green was obtained and

6  transported to Austin Police Department main headquarters.

7  Q.   Under arrest, you mean?

8  A.   That's correct.

9  Q.   Okay.  And so, what about the vehicle?  What happened

10 to it?

11 A.   The vehicle was towed to Austex Towing yard for a

12 hold for future search warrant.

13 Q.   All right.  Now, let me show you, if you'll find

14 Government's Exhibits 2 and 3.  Do you see those?

15 A.   Yes, sir, I do.

16 Q.   And what are those?

17 A.   That is Rodney Green's silver Impala.  That is the

18 vehicle in which Tammy was driving and which was towed to

19 Austex for future search warrant.

20 Q.   Okay.  Now -- and, your Honor, I, at this time, offer

21 into evidence Government's Exhibit 1, 2 and 3.

22       THE COURT:  No objection?

23       MR. ALDREDGE:  No objection.

24       THE COURT:  One, 2 and 3 will be admitted.

25 Q.   (BY MR. BUIE) Okay.  And okay.  So -- now, you

1  mentioned something being seen in plain view at the time

2  of Ms. Green's arrest.  What was that again?

3  A.   Those were gloves which were observed during one or

4  mul -- or a multitude of the bank robberies or multiple

5  bank robberies.

6  Q.   Okay.  I'm just trying to understand.

7  A.   Yes, sir.

8  Q.   What was seen in the car.

9  A.   Okay.

10 Q.   It was gloves in the car?

11 A.   There was.  It was gloves in plain view on the

12 backseat.

13 Q.   Okay.  And so, if you look at Government's Exhibit 4,

14 what is that, please?

15 A.   That is a gray pair of gloves, black undertone with

16 right -- with white writing on the top.

17 Q.   All right.  Where did this photograph show the glove?

18 A.   Those gloves were located on the -- in plain view on

19 the backseat.

20 Q.   Okay.  So that's what we're looking at, picture of

21 the gloves on the backseat?

22 A.   Yes, sir.  That is correct.

23 Q.   Okay.  And then, if you look at Government's Exhibit

24 No. 5, what is that?

25 A.   That is going to be the same pair of gloves which

1  were located inside the vehicle.

2  Q.   Okay.  Now, they look different in Government's

3  Exhibit 5 than in Government's Exhibit 4.  I mean, are

4  they in a different location in Government's Exhibit 5?

5  A.   So Government Exhibit 4, I believe those gloves were

6  actually photographed on the backseat of the vehicle.

7       Government Exhibit No. 5, those were taken by APD

8  crime scene detective.

9  Q.   Okay.  It like at the police station or wherever they

10 keep the evidence, something like that?

11 A.   I was not there, but yes, sir, I believe so.

12 Q.   All right.  So was that vehicle eventually searched

13 pursuant to a state court search warrant?

14 A.   Yes, sir.  After the search warrant was obtained.

15 Q.   Okay.  And let me ask you to look at -- well, first,

16 let me just ask:  What else, if anything, was found in the

17 vehicle that had evidentiary value?  In the vehicle, that

18 is.  So there were gloves on the -- that you mentioned

19 that were on the -- I believe, the backseat?

20 A.   Yes, sir.

21 Q.   Anything else that you can recall?

22 A.   There was a mask that was found.  I believe it was

23 silver.

24 Q.   Okay.

25 A.   There was a silver mask of non-evidentiary value that

1  was found in the vehicle.

2  Q.   A silver what?  I'm sorry.

3  A.   A mask.  There was a mask.

4  Q.   Okay.

5  A.   Not evidentiary value mask.  Additionally, inside the

6  vehicle, there was additional pair of gloves that was

7  located.

8  Q.   Okay.  So if you look at Government's Exhibit 7, what

9  is that, please?

10  A.   That is additional pair of gloves, which the FBI

11  believes were used in a separate bank robbery.

12  Q.   And are you saying those were the ones that were

13  found when the car was searched pursuant to a warrant?

14  A.   Yes, sir.  There was two pairs of gloves that were

15  found in the vehicle pursuant to the warrant.

16  Q.   Okay.  Your Honor, I'll offer Government's 4, 5 and

17  7.

18          MR. ALDREDGE:  No objection.

19          THE COURT:  Four, 5 and 7 will be admitted.

20          MR. BUIE:  Did you say no objection?

21          MR. ALDREDGE:  I said no objection.

22  Q.   (BY MR. BUIE) Okay.  I'm sorry.

23          All right.  So after that, after Ms. Green's

24  arrest, ultimately there was the search of the vehicle.

25          What other investigation took place at the Studio

1  6 Motel after she was arrested and taken away?

2  A.   Yes, sir.

3         We had agents on the ground, additional San

4  Marcos Police detectives conducting surveillance in an

5  intent to finally locate Mr. Green.  During the time that

6  Tammy was with APD, detectives saw a male several times

7  peek outside the window, looking outside.

8         Additionally, later that evening, after that

9  occurred, they saw an individual that they believed to be

10  Rodney Green walk down the stairs and walk out in the

11  parking lot towards I-35 with a stack of cash in his hand.

12  He, Mr. Green, did meet up with, I believe, a black Volvo,

13  unknown transaction occurred or conversation occurred.  We

14  do not know what happened there.  Then Mr. Green is

15  observed walking back towards the hotel room.

16  Q.   Okay.  At some point, did law enforcement officers

17  obtain a second search warrant?  Not just the one for the

18  car but a different one.

19  A.   That's correct.

20  Q.   What was that search warrant for?

21  A.   That search warrant was for the Studio 6 hotel Room

22  359 and a backpack.

23  Q.   Okay.  Let me show you if you'll look all the way to

24  the very back of the stack to what's been marked as

25  Government's Exhibit No. 23.  I'll confess, a fairly poor

1   photograph, but I want you to find -- just tell me if

2   you've seen that before.

3   A.   Yes, I have.

4   Q.   And what is it, please?

5   A.   I believe that is going to be the receipt for the ATX

6   Self-Storage, storage unit, which is immediately up the

7   road from the Studio 6 Motel.

8   Q.   Where did this receipt come from or where did law

9   enforcement find it?

10  A.   That Studio -- that particular receipt was located

11  inside Room 359.

12  Q.   And could you just -- I apologize for this being such

13  a bad copy, but could you just walk us through what we can

14  see there?  There's a name over to the left and, I think,

15  a date for -- payment date and some other things like

16  that.

17  A.   Yes, sir.

18          That is a camera receipt for the ATX Self-Storage

19  on I-35, within close proximity to the Studio 6 hotel.

20  The date of payment was April 28th, 2018.  Tammy Green did

21  make that payment.  Additionally, on the seat -- on the

22  receipt, they listed a address of 23 Loyola Lane in

23  Austin, Texas.

24  Q.   What's the significance of that address?

25  A.   That is the -- that was the known address for

1   investigators at the time of Mr. Rodney Green.

2   Q.   Did you or other agents do any investigation at the

3   ATX Self-Storage?

4   A.   Yes, sir, we did.   The next day, after Mr. Rodney

5   Green was taken into custody, multiple task force officers

6   and, additionally, APD detectives and the San Marcos

7   Police Department detective did perform a search pursuant

8   to state search warrants on the storage unit.

9   Q.   All right.   Briefly summarize what, if anything, was

10   found in the search warrant that was of evidentiary value.

11   A.   Yes, sir.

12        So what was found of evidentiary value at the

13   storage unit was the black jacket with the -- black jacket

14   -- black hooded jacket with a subdued stripe down the

15   middle, or at least across the back hooded -- the back of

16   the hood.   Additionally, a handgun was located inside the

17   storage unit that was located with inside a boot, which

18   was consistent with the handgun that was used in multiple

19   bank robberies in which that we had observed through

20   either still photographs from bank robbery surveillance

21   video or through actual surveillance video.

22        Additionally derived from that state search

23   warrant pursuant to the search warrant, we later found a

24   white knitted mask, which was located inside the black

25   hooded jacket, which we -- which investigators initially

1  did not discover until a later point in time.

2  Q.   So you got a search warrant for one particular

3  storage space at the ATX Self-Storage, correct?

4  A.   That is correct.

5  Q.   Is that the one that Tammy Green had rented?

6  A.   That's correct.

7  Q.   And just remind us how the dates goes.  On the

8  payment receipt, I think you said payment date, April

9  28th.  And what -- when is that in relation to the Bank of

10 America robbery?

11 A.   The Bank of America robbery occurred on the -- the

12 morning of the 28th of April.

13 Q.   And other than the payment receipt, the fact that

14 whatever it shows as far as Tammy Green having rented that

15 space, does any other evidence from the ATX Self-Storage

16 connect Mr. Green or Ms. Tammy Green besides just this

17 document?

18 A.   Yes.  That's correct.

19 Q.   What would that be?  What other evidence?

20 A.   That would be a positive latent fingerprint, which

21 was lifted from the magazine of the pistol, which is

22 located in the storage unit.

23 Q.   Okay.  Let me hold off on that for just a moment.

24       Did agents speak to anyone, interview any

25 witnesses that were connected with the ATX Self-Storage

1  business?

2  A.   That's correct.  Witnesses that were employees of the

3  ATX Self-Storage, they remembered both Mr. Rodney Green

4  and Tammy Green arriving, I believe it was, during a

5  promotional day or their -- they -- yes.  They remember

6  Mr. Rodney Green because he was eating their popcorn and

7  he was -- yes.

8  Q.   All right.  So let me show you what's been -- first

9  of all, let me -- your Honor, I'll offer Government's

10  Exhibit 23, which is a really bad image of that receipt.

11        THE COURT:  Any objection to that?

12        MR. ALDREDGE:  No, your Honor.

13        THE COURT:  All right.  Twenty-three will be

14  admitted.

15  Q.   (BY MR. BUIE) And so, next, Special Agent Forrest,

16  will you find what's been marked as Government's Exhibit

17  9?

18  A.   Yes, sir.

19  Q.   Let me know when you found that.

20  A.   Yes.

21  Q.   What does that show?

22  A.   That was the pistol that was located within the

23  storage unit.  That pistol was particularly located with

24  inside a cowboy boot.

25  Q.   Okay.  And then, what about Government's Exhibit 10,

1    the very next one?  Is that the same gun or a different

2    gun?

3    A.   That is the same gun.

4    Q.   Okay.  So just photographed in a different setting or

5    position than when it was inside the boot?

6    A.   That's correct.

7    Q.   All right.  Now, you mentioned, a moment ago, a

8    latent fingerprint.  Tell the Court about that again,

9    please.

10   A.   APD was able to -- Austin Police Department was able

11   to identify and locate a latent fingerprint on the

12   magazine for the pistol.  That latent fingerprint was

13   lifted by the Austin Police Department.

14   Q.   Okay.  And who did -- did they find out who that

15   print belonged to?

16   A.   They did.  They received a positive identity or

17   positive hit from that latent print for Mr. Rodney Green.

18   Q.   Okay.  All right.  I'll offer Government's Exhibits 9

19   and 10.

20          MR. ALDREDGE:  No objection.

21          THE COURT:  Nine and 10 will be admitted.

22   Q.   (BY MR. BUIE) Now, let me ask you to find

23   Government's Exhibits 11 and 12.  And just tell me when

24   you found them so I could ask you a couple of questions

25   about them.

1   A.   Yes, sir.  I did locate them.

2   Q.   What are those?  And if they're the same thing or

3   different things, could you just explain what they are?

4   A.   Yes.  Both of those photographs are the same article.

5   Those are both photographs taken of the black hooded

6   jacket, which was located inside the storage unit.

7   Q.   Okay.  Now, they look -- these pictures look

8   different.  One looks kind of blue and one looks black.

9   Do you know why that is?

10  A.   I believe it was probably the exposure of -- from the

11  light at the time the photograph was taken.

12  Q.   Okay.  So Government's Exhibit 11, where you see

13  somebody's hand off to the left side, where is that one

14  photographed?

15  A.   I was not there at the time that the search was

16  performed.  So that could either -- I believe --

17  Q.   Okay.  If you don't know.

18  A.   I do not know.

19  Q.   Okay.  All right.

20       Okay.  So, your Honor, I'll offer Government's

21  Exhibits 11 and 12.

22       MR. ALDREDGE:  No objection.

23       THE COURT:  Eleven and 12 will be admitted.

24  Q.   (BY MR. BUIE) Now, let me ask you to find

25  Government's Exhibits 15 and 16.  Do you have those?

1    A.   Yes, sir, I do.

2    Q.   Let's start with 16.  What is that, please?

3    A.   Sixteen is a white -- it looks like a white -- it's a

4    white knitted mask.  I believe it was originally a white

5    stocking cap that was converted to a mask.  Now, this

6    particular item of evidence was important to the FBI due

7    to the fact that we believed this mask was used not only

8    for the Bank of America in San Marcos bank robbery, but it

9    was also utilized during the bank robbery which occurred

10   on April 7th, the BB&T Bank here in Austin, Texas.

11   Q.   Okay.  So -- but Government's Exhibit 16, a

12   photograph, does that show something that was found in the

13   storage unit at ATX Self-Storage?

14   A.   That's correct.  So originally and ultimately, the

15   black hooded jacket with the subdued stripe, the subdued

16   black stripe was located within the Austin -- Austin Texas

17   Storage unit.  Originally at the time of the search,

18   officers, detectives had missed or not located the white

19   mask at -- which was actually located, at later point in

20   time, during a secondary search of the articles that were

21   originally seized within the left sleeve of that jacket.

22   Q.   Okay.  So when we look at Government's Exhibit 15,

23   you've got something that seems to be coming out of a

24   sleeve.  Is that what you're talking about?

25   A.   Yes, that is.

1  Q.   Okay.  The government offers Government's Exhibits 15

2  and 16.

3          MR. ALDREDGE:  No objection.

4          THE COURT:  Fifteen and 16 are admitted.

5  Q.   (BY MR. BUIE) All right.  So let me ask you next to

6  find what's been marked as Government's Exhibit 14.  Do

7  you see that?

8  A.   Yes, sir, I do.

9  Q.   What is that -- what appears in that picture?

10 A.   That is going to be from the Bank of America -- the

11 Bank of America bank robbery, which occurred on the 28th

12 of April.

13 Q.   Okay.  Who is facing the camera there?

14 A.   The --

15 Q.   In other words, not the name of the person but just

16 what is that person doing?

17 A.   Committing a bank robbery.

18 Q.   Okay.  And the person whose back is to the camera,

19 who was that?

20 A.   That would be the victim teller.

21 Q.   Did anyone talk to that person subsequent to the

22 robbery?

23 A.   Yes.  That is correct.

24 Q.   Did that person describe what happened during the

25 robbery or how -- what she thought or how she felt during

1  the robbery?

2  A.   Yes.

3       That victim did confirm that the handgun was

4  pointed in her direction and that she was in fear for her

5  life.

6  Q.   Okay.  And did she -- was she the one that gave the

7  robber some money that he left with?

8  A.   That's correct, sir.

9  Q.   Okay.  Now, of the items that we've been talking

10 about, would you just tell the Court which of the items of

11 evidence that we've been discussing, if any, appear in

12 this photograph?

13 A.   In 14, sir?

14 Q.   Yes.  In Government's Exhibit 14.

15 A.   That is going to be the white knitted mask, which, I

16 believe, was originally converted from white stocking cap,

17 which was located -- originally located inside the Austin

18 Texas Storage unit, inside the black hooded jacket, which

19 was also located at the storage unit.

20 Q.   Okay.  Now, so is the mask -- is that the only thing

21 in this picture that you recognize from other places like

22 evidence that was seized or whatever the case may be?

23 A.   No, sir.

24      So that white mask, the white knitted mask in

25 Exhibit 14 was utilized in bank robbery No. 4 and 5.  Now,

1   out of the total of five bank robberies, the black hooded

2   jacket was used in the last four out of the five.

3   Q.   Okay.  When you say black hooded jacket, does it

4   appear in Government's Exhibit 14?

5   A.   Yes, it does.

6   Q.   All right.  So what, if anything, is distinctive

7   about the -- I mean, it's a -- on the picture, you can see

8   it's a black jacket.  Is there anything distinctive about

9   it?

10  A.   There is.  It's a black hooded jacket with a very

11  subdued black stripe or black smooth stripe area that runs

12  down the hood of the jacket.

13  Q.   Okay.  Now, we have pictures of a jacket and that's

14  Government's Exhibits -- Government's Exhibit 12, 15 and

15  11.

16          Can you -- is there anything that you can point

17  the Court to there to match up with what you're talking

18  about from Government's Exhibit 14?

19  A.   Yes.

20          If you look at Exhibit 12, you can clearly see

21  that there is a center portion of the jacket on the hood,

22  which I've been calling a subdued stripe.  It's actually

23  just a center portion that is somewhat of a divided

24  portion on the jacket.

25  Q.   Okay.  All right.  So now, let me ask you -- let's

1    see.  I'll offer Government's Exhibit 14.

2          THE COURT:  Any objection?

3          MR. ALDREDGE:  No objection.

4          THE COURT:  Government's 14 will be admitted.

5    Q.  (BY MR. BUIE) Now, let me -- let me ask you to find

6    and look at Government's Exhibit 18.  My apologies for the

7    quality of the picture.  Once you find it, just tell me

8    whether you've seen this before.

9    A.  Yes, sir.

10         That is going to be a still photograph taken from

11   the bank robbery surveillance video.  That bank robbery

12   occurred at the BB&T Bank on April 7th of 2018 in which

13   the suspect entered the bank, wearing the same black

14   hooded jacket from the San Marcos bank robbery.  And the

15   exact same -- and the same -- the same mask from the bank

16   robbery.

17         During that bank robbery, the suspect walked

18   inside the bank, when they got up to the teller and

19   additionally tapped the gun on what's known within the

20   banking industry as a bandit barrier.

21   Q.  Okay.  And do you see the gun in this picture?

22   A.  I do.

23   Q.  Where is it just from -- start from the middle and

24   point to whether it's up, down, left or right.

25   A.  If you're going left to right, it's approximately

```
 1  inch and a half to the right from the left side of the
 2  paper.
 3  Q.   Okay.  From on the left edge?
 4  A.   Yes.  That's correct.
 5  Q.   Okay.  Your Honor, I'd offer Government's Exhibit 18.
 6        MR. ALDREDGE:  No objection.
 7        THE COURT:  Government's 18 is admitted.
 8  Q.   (BY MR. BUIE) Let me ask you to find what's been
 9  marked as Government's Exhibit 6.
10  A.   Yes, sir.
11  Q.   Okay.  What is that, please?
12  A.   That is a exhibit from February 24th, 2018.  The
13  reason this is a significant bank robbery.
14  Q.   Let me just ask you --
15  A.   Yes.
16  Q.   It's a picture, right?
17  A.   That's correct.
18  Q.   Okay.  What's the picture of?
19  A.   That is a picture from the bank robbery -- it's a
20  still photograph taken from the bank robbery surveillance
21  video during the February 24th, 2018 bank robbery of the
22  Compass Bank on Cameron Road.
23  Q.   That's here in Austin?
24  A.   That is correct.
25  Q.   Okay.  So now, you've talked about a bank robbery in
```

1    San Marcos.  You've talked about a BB&T Bank where he

2    tapped a gun on the glass.  And then, now, is this a

3    different robbery from those?

4    A.   Yes.

5         This is -- in our string of five bank robberies,

6    this is our -- this is going to be our third bank robbery.

7    Q.   Okay.  So if -- what, if anything, do you see in this

8    photograph that's distinctive with relation to any of the

9    evidence that we've already discussed?

10   A.   Distinctive within this photograph, speaking on

11   evidence, is going to be the gray gloves with the white

12   insignia on the top.

13   Q.   Okay.  Now, let me just stop you for a second, just

14   ask you to find so we can just refer back.  Talking about

15   -- I'm looking at Government's Exhibit 5.  Do you have

16   that one?

17   A.   Okay.  Give me one second, please.  Yes, sir.  Go

18   ahead.

19   Q.   Okay.  Government's Exhibit 5 and Government's

20   Exhibit 6, what, if anything, is the connection?

21   A.   The connection between these two particular exhibits

22   is going to be the gray gloves with the white insignia on

23   top.

24   Q.   Okay.  And do you see those in Government's Exhibit

25   6?

1    A.    Yes, sir.

2    Q.    Lower left-hand corner?

3    A.    That's correct.

4    Q.    Okay.  What about the firearm in Government's Exhibit

5    6?

6    A.    The firearm in Exhibit 6 is the firearm that is very

7    similar in nature to the firearm used in all five bank

8    robberies.

9    Q.    Okay.  And I'm just comparing it to Government's

10   Exhibit 10, which is already in evidence.  Is there

11   anything, in particular, about Government's Exhibit 10

12   that the Court can see that makes you think that's the

13   same gun as Government's Exhibit 6?

14   A.    Yes, sir.

15   Q.    What would that be?

16   A.    It's similar in color in the -- similar in color;

17   it's black.  Additionally, it has a -- looks like a worn,

18   shiny slide, which is used to actually chamber a round in

19   the vehicle -- excuse me, not the vehicle.  Excuse me, in

20   the gun.

21   Q.    Okay.  What about the size of the gun?  Can you tell

22   anything about it either in Exhibit 6 or just from -- have

23   you seen the gun physically yourself?

24   A.    I -- no, sir.  I have not.

25   Q.    Okay.  Do you know anything about the size of the gun

1   just from other investigation?

2   A.   Yes, I do.

3   Q.   And is it consistent with the size of -- that appears

4   in Exhibit 6?

5   A.   That's correct.

6   Q.   Is that kind of big, kind of small?  How would you

7   describe it?

8   A.   It's a smaller to medium size gun.

9   Q.   Okay.  I'd offer Government's Exhibit 6, if I haven't

10   already.

11          MR. ALDREDGE:  Again, we have no objection.

12          THE COURT:  Exhibit 6 is admitted.

13   Q.   (BY MR. BUIE) Government's Exhibit -- let me ask you

14   to take a look at Government's Exhibit 17.  Do you have

15   that?

16   A.   Yes, sir.

17   Q.   Okay.  And actually, I'm going to skip that one

18   because the picture's not very good.

19          So let me ask you to take a look at Government's

20   Exhibits 19 and 20.  If you'll find those, please.

21   A.   Yes.  That is correct.  I have 19 and 20.  Go ahead.

22   Q.   Okay.  What do those show, those pictures?

23   A.   Those are shoes what were seized within the Austin

24   Texas Storage unit.

25   Q.   Okay.  And do those shoes or shoes consistent with

1  those show up in any of the robberies that you have

2  investigated?

3  A.   Yes.

4        Out of our nine series robbery investigation,

5  which not only includes five bank robberies, which we also

6  have four Hobbs Act violations, during a robbery which

7  occurred on the 26th of December, 2017, those shoes were

8  observed in a surveillance video.

9  Q.   Okay.  Let me ask you to look at what's been marked

10  as Government's Exhibit 21.  Can you find that?

11  A.   Yes, sir, I do.  I see those.

12  Q.   Do you know which -- you know what this picture

13  shows, Government's 21?

14  A.   Yes.

15        So this is an important picture for the FBI due

16  to the fact that our first five robberies, including four

17  Hobbs Act violations, which is a commercial robbery, and,

18  also, one bank robbery, we had the exact same jacket used,

19  which was this darker color jacket with the white stripe

20  across the middle with insignia in the chest area.

21        Additionally, in Exhibit 21, you do see shoes

22  that are consistent with the sneakers that were used in

23  the 12-26 of 2017 Boost commercial robbery.

24  A.   Okay.

25  Q.   And are they also consistent with Government's 19 and

1  20?

2  A.   Yes, sir, they are.

3  Q.   Okay.  I'd offer Government's 19, 20 and 21.

4          MR. ALDREDGE:  No objection.

5          THE COURT:  Nineteen, 20 and 21 are admitted.

6  Q.   (BY MR. BUIE) Okay.  Now, if you -- so on 21 is from

7  -- do you know which robbery this is, No. 21?  If you

8  don't, that's -- just if you can remember.

9  A.   No, sir.  I cannot recall which robbery this was.

10 Q.   Okay.  But you mentioned the jacket.  And so, that

11 jacket or some kind of a hooded garment with the stripe

12 across the chest, how many robberies did that appear in?

13 A.   That jacket occurred in five total robberies,

14 including four commercial robberies, which is a Hobbs Act

15 violation, and one bank robbery -- first bank robbery,

16 which occurred on the 24th of January this year at a Chase

17 Bank in Austin, Texas.

18 Q.   Okay.  Would you find what's been marked as

19 Government's Exhibit 22?

20 A.   Yes.

21 Q.   Do you have it?

22 A.   Yes, sir, I do.

23 Q.   What does that show?

24 A.   I believe that's going to be footage from the first

25 bank robbery, which occurred on January 24th, 2018, which

1    is at Chase Bank.  This is a important bank robbery for

2    the FBI because not only does the suspect point a gun at

3    people, the suspect also indicated he had a bomb on them

4    and that he -- it would go off if they didn't obey his

5    commands.

6    Q.   And the dark garment with the hood, is that a garment

7    that you've seen in connection with other robberies that

8    you've investigated?

9    A.   Correct.

10          So Exhibit 22 is going to be the Chase Bank

11   robbery.  And the other photographs, I observed of the

12   suspect.  And the black jacket with the white stripe is

13   going to be the commercial robberies.

14   Q.   Okay.  And including Government's Exhibit 21?

15   A.   That's correct.

16   Q.   All right.  We'll offer Government's Exhibit 22.

17          MR. ALDREDGE:  No objection.

18          THE COURT:  Twenty-two's admitted.

19   Q.   (BY MR. BUIE) Okay.  So the -- now, you didn't

20   find -- you or other officers didn't find that garment

21   with the white -- light stripe across the chest, you

22   didn't find that at the ATX Self-Storage, did you?

23   A.   No.  We did not.

24   Q.   Okay.  Or anyplace else, you don't have that, do you?

25   A.   No.  We do not.

1  Q.   Okay.  Has that garment showed up in your

2  investigation anywhere other than the five robberies that

3  you mentioned?

4  A.   It did.  So the exact same day as the first

5  commercial robbery, which was December 26, 2017, that

6  hoody with the white stripe was observed inside a pawnshop

7  here in Austin, Texas.

8  Q.   Okay.  And, I mean -- so it wasn't there just by

9  itself, was it?  I mean.

10  A.   No.  That's correct.

11  Q.   Could you see who was wearing it?

12  A.   I believe, yes, it was Tammy Green.

13  Q.   All right.  And was anyone with her at that time, or

14  was she there by herself?

15  A.   We believe that individual that was with her was Mr.

16  Rodney Green.  We believed that the female wearing that

17  jacket was Mrs. Tammy Green.

18  Q.   I'll pass the witness, your Honor.

19                    CROSS-EXAMINATION

20  BY MR. ALDREDGE:

21  Q.   Good afternoon, Agent.

22  A.   Good afternoon.  How are you doing?

23  Q.   Good.  How are you?

24  A.   Good.

25  Q.   Can you tell me how much money was taken at the April

1  28th robbery in San Marcos?

2  A.   Yes, sir.

3        I can't tell you the exact amount, but it was

4  10,800.  And I'm not sure on the remaining dollars, but

5  the loss was 10,800.  And I'm going to be approximate

6  here, but I believe it was $10,847.

7  Q.   And what about the other robberies?

8  A.   I can't -- I can't recall off the top of my head what

9  the exact number was, at this point in time, taken from

10  the other banks, but there was money taken.

11  Q.   Okay.  So -- but not something that would initially

12  stick out in your memory, would it?  It wasn't a huge

13  quantity of money; is that right?

14  A.   It just -- the particular number does not, yes, stick

15  in mind.

16  Q.   Okay.  Did Mr. Green make any statement, at any

17  point, after being taken into custody?

18  A.   Yes, he does.

19  Q.   Okay.  Can you describe what statements he might have

20  made?

21  A.   These were statements that were not derived from

22  being questioned.  These were statements on the scene

23  after he was taken into custody.  Immediately after the

24  search warrants being signed, the Hays County DA gave

25  verbal permission to the San Marcos Police detective to go

1  ahead and take Mr. Green into custody.  After Mr. Green

2  was taken into custody --

3  Q.   I'm sorry.  Which search warrants are we talking?

4  A.   This is the state search warrants of the --

5  Q.   So the storage and the --

6  A.   No.  Not -- no, sir.  Not the storage.  This is going

7  to be at the scene of the hotel where he was actually

8  taken into custody.

9  Q.   Oh, so there were two different search warrants?

10 A.   So there was two different search sites.  Correct.

11 And so, the original search warrant was for the vehicle.

12 Q.   Right.

13 A.   The backpack and the hotel room.  The next day, which

14 was the 30th, San Marcos Police obtained a search warrant

15 for the Austin Texas Self-Storage unit.

16 Q.   Okay.  The vehicle, of course, is the silver Impala?

17 A.   That's correct.

18 Q.   And then, why is there a separate search warrant for

19 that?  Or why is the backpack listed as a separate target

20 of the search warrant?

21 A.   So within the first search warrant, there is three

22 things that were practically named.

23 Q.   Right.

24 A.   The backpack, the hotel room.

25 Q.   How does that come in separate?  Where was the

```
 1  backpack found?
 2  A.   Okay.  So the backpack was found on Mr. Green's
 3  person when he was detained.
 4  Q.   Okay.
 5  A.   Yes, sir.
 6  Q.   That's what I didn't understand.
 7           So sorry.  I'd interrupted you.  You were
 8  describing that after the search warrants were signed, San
 9  Marcos PD gave verbal permission to detain --
10  A.   That's correct --
11  Q.   -- my client --
12  A.   -- the Hays County prosecutor's office.
13  Q.   Okay.  And so, then --
14  A.   Gave verbal to go ahead and detain pursuant --
15  Q.   And I'd asked you what, if any, statements Mr. Green
16  made.
17  A.   Yes, sir.  That is correct.
18           So after he was detained, he was placed in a
19  Austin Police patrol car in which officers, agents on the
20  scene did hear Mr. Green making statements when he was
21  yelling outside the window.
22  Q.   And what were those statements?
23  A.   "You didn't find my weapon.  You didn't find my
24  weapon.  You didn't find my gun."  He said something to
25  the effect and this is not -- this is not verbatim.
```

1  Something to the effect of "You didn't catch that one in

2  1994 and that I've been doing this for 40 years."

3  Q.   Okay.

4  A.   Additionally, a task force officer with the FBI

5  recalls Mr. Green saying that he's been doing this for 40

6  years and that he was tired.

7  Q.   And when was that statement made?

8  A.   That was around 12:00 at night.  So that could have

9  been either on the 29th, which was Sunday, and this rolled

10  into to Mon -- very early Monday --

11  Q.   But still there --

12  A.   -- morning.

13  Q.   Still there on the scene at the Studio 6?

14  A.   That would have been out in the parking lot of the

15  Studio 6.

16  Q.   Okay.  Now, are there any other -- were there any

17  recorded phone calls that police or FBI were able to

18  obtain?

19  A.   As far as the FBI personally obtaining or

20  investigatively obtaining phone calls, no.  But as a

21  umbrella, since this is an investigation that involves a

22  multitude of different agencies, both local and federal,

23  yes, San Marcos had retrieved calls from the jail and

24  that's what I'm aware of.

25  Q.   And --

1   A.   Unless I'm --

2   Q.   -- is there any significance to those calls?

3   A.   All I know from one of the -- one of the calls from

4   the jail is that Mr. Green was informed that the FBI had

5   searched the storage unit.

6   Q.   And who informed him of that, do you know?

7   A.   What I was -- what I was told is that was Mrs. Tammy

8   Green.

9   Q.   Okay.  And did he -- is there any -- anything

10  particularly noteworthy about his reaction or?

11  A.   I don't recall anything noteworthy.  No, sir.

12  Q.   Okay.  So you said earlier, that someone observed and

13  I just didn't catch who it was.

14  A.   Yes.

15  Q.   Someone had observed when Tammy Green was checking in

16  that she had paid with fresh bills.

17  A.   That's correct.

18  Q.   And who was that that?

19  A.   There was two witnesses that observed her check in

20  that we know of.  Those witnesses are going to be the

21  person at the desk of the hotel.  And additionally, there

22  was also the Austin Police Department police officer, a

23  patrol officer who was there within the lobby on a

24  separate matter.

25  Q.   Oh.

1  A.   And that happened to be the same patrol officer that

2  we made contact with the next day, on the 29th, in regards

3  to this matter that was ongoing.

4  Q.   Okay.  So I -- there in the discovery I've seen, I

5  forget which document it is or documents.  There's

6  indication that law enforcement believed that Tammy Green

7  is either an accessory or an accomplice.  And what I heard

8  today is that she was seen at the pawnshop dressed in the

9  jacket or hoody with a white stripe.

10        Is there anything else that -- other than their

11  being married and together, that on the highway and the

12  various scenes that you've described, is there any

13  particular evidence you could point to that would -- would

14  point to her as being an accomplice or an accessory,

15  involved in the robberies?

16  A.   Approximately 30 to 45 minutes somewhere, it was

17  approximately after the robbery occurred in San Marcos on

18  the 28th, agents, TFOs, investigators were able to

19  determine that both Mr. Rodney Green and Tammy Green did

20  go to the Wal-Mart in south Austin within the, you know,

21  30- to 40-minute range -- and this is approximate -- and

22  they did make a purchase at the Wal-Mart 30 to 45 minutes

23  approximately after the bank robbery did occur in San

24  Marcos.

25  Q.   Okay.  And what was purchased?

1    A.    A gold chain.

2    Q.    So that would have been -- I think you described the

3    robbery as having been about 9:05 on Saturday morning?

4    A.    So the police reports or affidavits indicate that the

5    bank robber entered the bank at 9:03 a.m.

6    Q.    Okay.

7    A.    And indicated that the bank robber left the scene in

8    approximately 9:05, or that's when he was seen exiting the

9    bank at 9:05 a.m.

10   Q.    Okay.  Where -- is there anything else along that

11   lines of evidence pointing to Tammy Green -- to Tammy

12   Green being involved?

13   A.    I don't recall right now.

14   Q.    Okay.  Where was the receipt found for the ATX

15   Self-Storage?

16   A.    The receipt was located within Room 359, after the

17   state search warrant was executed.

18   Q.    Okay.  And did I hear you say that that hotel room

19   had been rented that day?

20   A.    No, sir.  That's incorrect.

21   Q.    Okay.

22   A.    When we made contact with Rodney Green, it was -- and

23   these times are approximate.  It was before midnight on

24   the 29th.  And we had located the vehicle -- the suspect

25   vehicle approximately 2:00 on the 29th, in the afternoon.

1  And so -- no.

2  Q.   So when was the room rented first?

3  A.   So Tammy Green checked into the room on the 28th of

4  April.

5  Q.   And the 28th of April --

6  A.   Was yes, a Sunday of the bank robbery.  That's

7  correct.

8  Q.   Okay.  Exhibits 13 and 14, what -- which bank robbery

9  were these taken from?

10  A.   Give me one second, please.

11       Exhibit -- Government Exhibit 14 is going to be

12  the Bank of America bank robbery in San Marcos, Texas,

13  which was on the 28th of April.

14  Q.   Okay.

15  A.   Government Exhibit 13, and I cannot be for sure on

16  this, but I believe this particular photograph, Government

17  Exhibit 13, is going to be from the BBVA Compass Bank

18  robbery, which was actually robbed twice by the

19  individuals wearing the same black jacket during both of

20  those robberies.

21       The first robbery, a dye pack went off, and that

22  was on February -- that was on February 8th.  As the

23  suspect leaves the bank, you can actually see a dye pack

24  going off in the surveillance video.

25       The next bank robbery, which is the third bank

1   robbery in the string of five, occurred on the 24th of

2   February.  The same suspect wearing the exact same clothes

3   -- or not the same clothes, very close to the clothes --

4   comes back in the same bank, goes to the same teller and

5   tells them:  "I'm robbing you for a second time.  I only

6   have three months to live, and I don't care who I take

7   with me."  That really startled the bank teller.  So this

8   bank was robbed twice.

9   Q.   Was there a gun displayed, brandished?

10  A.   Yes.  That's correct, in both of the bank robberies.

11  At that time BBVA Compass.  I believe that was 5700

12  Cameron Road, BBVA.

13  Q.   Okay.  And tell me when -- you mentioned that one of

14  the commercial robberies was on December 26th.  What were

15  the dates of the other -- the other three commercial

16  robberies?

17  A.   Yes, sir.

18         So we have four commercial robberies.  The first

19  commercial robbery occurred on December 26th of 2017,

20  which was a Boost store.  The second commercial robbery

21  was on 12-28 of '17, December 28th of '17, which is a

22  Cricket store.

23         Now, all -- the Cricket store is important

24  because that's the only robbery that we -- that a gun was

25  not utilized.  A knife was utilized on the second

1   commercial robbery.  The third commercial robbery occurred

2   on the 28th of December 2017.  That was at Cricket.

3   Fourth was the Family Dollar store, which occurred on

4   January 7th of 2018.

5   Q.   Okay.  And then, the first bank robbery was the Chase

6   in Austin on January 24th?

7   A.   That's correct.  And that was the -- that was the

8   bomb threat, as well, on the January 24th, 2018, Chase.  I

9   believe that was on Lamar.  I can't remember the exact

10  address, but it was on Lamar.

11  Q.   Now, you indicated that the suspect in that one

12  threatened that he had a bomb and also pointed the gun.

13  Was the gun brandished or just shown, or was it actually

14  pointed at any other robberies?

15  A.   The witnesses indicate the gun was brandished and

16  pointed.  Additionally --

17  Q.   At all the robberies.  Or?

18  A.   Not -- no.  Not all the robberies.  So eight of the

19  nine in totality of the robberies, there was a weapon as

20  far as a handgun used.

21  Q.   Right.

22  A.   One of the robberies, which was the second commercial

23  robbery on 12-26 of '17, actually used a knife.

24  Q.   Okay.  But my question is.

25  A.   Uh-huh.

1   Q.   Was -- in the eight, the four commercial and four

2   bank robberies in which a gun was seen, was it always

3   pointed each time?

4   A.   It was pointed in a teller's direction.  Yes.  Yes.

5   If you read -- or if you speak to some of the witnesses

6   during the bank robberies, especially you can say the

7   second bank robbery, which was the BBVA Compass at 5700

8   Cameron Road, which occurred on the 2nd -- the 8th of

9   February, the suspect went and said, "Don't do anything

10  stupid or I'll shoot."  Additionally, it was pointed at

11  the teller's stomach in which she -- he indicated he was

12  very scared.

13        The third bank robbery was in the exact same

14  place, the BBVA Compass in which the suspect approached

15  the very same teller and said, "Don't do anything stupid.

16  I have three months to live," you know, and "I don't care

17  who I take with me."  That really scared obviously the

18  victim.

19  Q.   I don't have any further questions.

20                  RE-DIRECT EXAMINATION

21  BY MR. BUIE:

22  Q.   Find Government's Exhibit 13 again.

23  A.   Yes, sir.

24  Q.   See if you can locate that.  Or I'll just give you my

25  copy, let you read that.

1  A.   I just found it.  Yes, sir.

2  Q.   All right.  You said when you were answering Mr.

3  Aldredge's questions that that was the BBVA Compass Bank

4  robbery or one of the two.  Is that your recollection of

5  what this -- which bank this is?

6  A.   That is my recollection due to the fact that -- and I

7  don't remember, specifically, if both of -- as far as the

8  bank employees and the victims there on scene trying to

9  utilize the bank were pulled on the ground at that

10 particular -- those particular bank robberies.  And I

11 don't recall if they're pointed at the ground in both bank

12 robberies or just one.

13 Q.   Okay.  So is that what we see over in the lower

14 left-hand corner of Exhibit 13?

15 A.   That is correct.

16 Q.   Just say again what that is.  It looks like legs.

17 A.   Yes.

18       That would have been a patron, a person that was

19 trying to utilize the bank at the time the robbery

20 occurred.

21 Q.   You said they're lying on the floor?

22 A.   That's correct.

23 Q.   Why?

24 A.   Because the suspect came in with a gun and started

25 pointing and brandishing the weapon in people's direction.

1    I'm sure they were concerned for their safety.

2    Q.   Did the robber give the -- any of the witnesses or

3    victims any instructions, tell them to do anything, not to

4    do anything?  Remember anything like that?

5    A.   I do.  Yes, sir.  So I do.  During the commercial

6    robberies, the -- during the commercial robberies, the

7    suspect had told all the victims to count to a certain

8    number.  Whether that's 250 or 120 -- this is

9    approximate -- he told them to count to a rather large

10   number as far as in seconds until he -- until he left the

11   area.

12   Q.   When the firearm was discovered in the storage unit,

13   was any ammunition with it?

14   A.   Yes.  There was ammunition in the magazine, which was

15   inside the weapon.

16   Q.   And what caliber is that gun?

17   A.   I don't specifically recall, but I believe it was

18   either .380 or a nine-millimeter.

19   Q.   That's all I have, your Honor.

20          MR. ALDREDGE:  Nothing further.

21          THE COURT:  Thank you, Agent.  You may step down.

22          THE WITNESS:  Thank you, sir.

23          MR. BUIE:  That's all the government's evidence.

24   The government rests.

25          MR. ALDREDGE:  Your Honor, we don't have any

1  evidence.

2          THE COURT:  And that's for all purposes?

3          MR. BUIE:  Yes, your Honor.  Both for preliminary

4  hearing and detention.

5          THE COURT:  All right.  With regard to the

6  preliminary, I do find that the evidence is sufficient to

7  establish that there's at least probable cause to believe

8  that Mr. Green committed the offense charged in the

9  complaint, which is the April 28th, 2018 robbery.  You may

10  step down.

11          THE WITNESS:  Thank you.

12          THE COURT:  And so, I do find probable cause for

13  that.

14          With regard to detention, anything you want to

15  present or argue with regard to detention?

16          MR. BUIE:  Your Honor, I'd just -- number one,

17  the government has attempted to show that Mr. Green

18  engaged in a number of robberies.  We may not have gotten

19  into detail on all of them but, suffice it to say,

20  numerous robberies with what we believe to be a loaded

21  firearm.  He pointed a firearm at people on numerous

22  occasions.  It was loaded when it was found.  As the agent

23  testified, he was threatening people.  And so, his past

24  conduct demonstrates his dangerousness by clear and

25  convincing evidence.

1          Additionally, his criminal history, at least

2     insofar as is represented by the Pretrial Services

3     Officers, is quite extensive and serious.  And I believe

4     there is, I want to say, at least one occasion when there

5     was a bond revocation.  But I'm having trouble finding

6     that.  Yes.  June 7th, 1996 probation revocation on a 1994

7     conviction.  But those both just show that Mr. Green's a

8     danger.  And because he's failed to abide by bond

9     conditions in the past, or probation conditions, that he

10    shouldn't be trusted to abide by bond conditions in this

11    case here.

12          THE COURT:  Mr. Aldredge.

13          MR. ALDREDGE:  Your Honor, my client has one

14    felony conviction from 1985 and then, a few misdemeanor

15    convictions since then, by my count, to two or three

16    criminal history points.  So I'd submit that his criminal

17    history is not significant.  The more serious behavior,

18    including perhaps the bond -- probation revocation,

19    misdemeanor probation revocation that occurred over 20

20    years ago, is one felony conviction was over 30 years ago.

21          He has lived in this area for 30 years.  He's

22    married.  He is 58 years old.  I believe the evidence in

23    the pretrial report is that he would be stable.  He has no

24    -- nowhere to flee, no resources to flee with; and based

25    on that, any potential danger to the community the Court

1    might be worried about, the Court can address that, I

2    believe, with the conditions that you have at your

3    disposal to fashion.  We'd ask the Court to do that.

4          THE COURT:  Given the offense and the finding of

5    probable cause, this is a presumption offense because it's

6    crime of violence involving a firearm.  So there's a

7    presumption that the Court should detain the defendant or

8    that there aren't conditions, based on primarily -- and

9    this is not common, but in this instance, on the offenses

10   charged or this offense and the others that in which Mr.

11   Green is a suspect, I do think that the evidence on that

12   and the strength of the government's case is such that it

13   presents to the Court a risk of danger to the community

14   that could not be adequately addressed through conditions.

15   And the number of times in which it's alleged that Mr.

16   Green brandished a firearm in a public place and

17   threatened people with it is concerning.

18         And then, given Mr. Green's age at 58, the

19   potential sentences for these offenses, if convicted, are

20   substantial, there's -- and I don't know if you've had a

21   chance to go over this with him yet, but seven years is a

22   mandatory add-on for each brandishing and it sounded like

23   there were several.

24         So I think all of that combined, once Mr. Green

25   is aware of the potential penalties and given his age,

1   which I share with him -- I'm the same age -- so that

2   would be looking at a long time and maybe the rest of

3   one's life in jail.  And so, that would create certainly

4   the incentive to want to flee.

5          Given that, I'm going to enter an order of

6   detention because I don't find that there are conditions I

7   could set that would reasonably assure Mr. Green's

8   appearance or the safety of the community.

9          MR. ALDREDGE:  Your Honor, just so Mr. Green

10  doesn't misunderstand, it's actually each -- seven for the

11  first one plus 25 for each one after that.

12         THE COURT:  Thank you.  I was halfway through the

13  statute reminding myself before when this happened -- when

14  the evidence ended.

15         Mr. Green.

16         THE DEFENDANT:  So you're saying that I'm guilty.

17         THE COURT:  No, sir.

18         THE DEFENDANT:  Already?  That's what it sounded

19  like to me you were saying.

20         THE COURT:  No, sir.

21         I'm saying that if convicted, that would be what

22  you'd be looking at if you were convicted.  I have found

23  that there is probable cause to believe, but that's all I

24  found on the preliminary is there's probable cause.  But

25  no.  I -- you know, there's a lot still to be done in this

1  case for the government to prove it and for you to defend

2  it.  So --

3          THE DEFENDANT:  Oh, okay.  Thought you were --

4          THE COURT:  -- I'm not making any finding.

5          THE DEFENDANT:  -- sentencing me here.

6          THE COURT:  No, sir.  That will be somebody

7  else's job.

8          All right.  Anything else the Court needs to do

9  at this time?

10          MR. BUIE:  Not from the government, your Honor.

11          THE COURT:  Thank you.  Y'all may be excused.

12          (Proceedings conclude at 3:53 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2

3                    REPORTER'S CERTIFICATE

4

5     I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING

6  WAS TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE

7  TIME OF THE AFORESAID PROCEEDINGS AND IS A CORRECT

8  TRANSCRIPT, TO THE BEST OF MY ABILITY, MADE FROM THE

9  PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, AND THAT THE

10 TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE PRESCRIBED BY

11 THE COURT AND JUDICIAL CONFERENCE OF THE UNITED STATES.

12

13 /s/Lily I. Reznik                July 11, 2019

14 LILY I. REZNIK                   DATE

15

16

17

18

19

20

21

22

23

24

25
```